IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

HARTFORD FIRE INSURANCE : 
COMPANY, :
          Plaintiff, :
 :
      v. : Civil No. 5:21-cv-02466-JMG
 :
E.R. STUEBNER, INC., *et al.*, :
          Defendants. :

**MEMORANDUM OPINION**

**GALLAGHER, J.**                                                                                     January 25, 2022

**I.    OVERVIEW**

      The facts of this surety contest bring to mind the pivotal scene from *The Fugitive*. In that scene, Harrison Ford's character, who has been wrongfully convicted for murder but has escaped from custody, is cornered by Tommy Lee Jones's character, a U.S. Marshal whose sole purpose is to capture Ford and return him to prison. In desperation, Ford cries out to Jones, "I didn't kill my wife!" Coolly, Jones responds, "I don't care."[1]

      In this case, the parties are connected by a surety bond and two indemnity agreements. Plaintiff is the surety and indemnitee, and Defendants are the principals and indemnitors. The obligee to this performance bond terminated Defendants and brought a claim against the bond demanding Plaintiff take over Defendants' obligations. Defendants protested that they had been wrongfully terminated and that the obligee's bond claim was meritless. But Plaintiff's response was, essentially, "I don't care." Plaintiff honored the claim and took over the project in an attempt to minimize its own exposure to loss.

---

[1] THE FUGITIVE (Kopleson Entertainment 1993).

Defendants now claim that Plaintiff breached the duty of good faith and fair dealing implicit in their indemnity agreements by so callously honoring the obligee's allegedly meritless bond claim. Plaintiff has moved to dismiss Defendants' claim for failure to state a claim. Although Defendants, like Ford's character, may have been innocent, Plaintiff, like Jones's character, was within its rights not to care. Accordingly, the Court must grant Plaintiff's motion.

## II.   FACTUAL BACKGROUND

### a.   Allegations

This case revolves around a performance bond and two indemnity agreements. Under the performance bond, Plaintiff promised to take over Defendant Stuebner's obligations to complete a construction project for a school district under certain circumstances. Am. Compl. ¶¶ 15–16 (ECF No. 29); Am. Answer ¶¶ 15–16; Am. Answer, Ex. 1 ("Performance Bond"). And under the indemnity agreements, executed in 2001 and 2018 respectively, Defendants promised to indemnify Plaintiff for certain expenses Plaintiff would incur if ever it had to take over Defendant Stuebner's construction project. Am. Compl. ¶¶ 17–18; Am. Answer ¶¶ 17–18; Am. Compl. Ex. A ("2001 Agreement"), Ex. B ("2018 Agreement").

All Defendants except Peter Radwanski executed the 2018 Agreement as indemnitors. And all Defendants except Douglas and Maria George executed the 2001 Agreement as indemnitors. The agreements are not identical but follow the same contours.

Both agreements provided Plaintiff could take over Defendant Stuebner's project after certain triggering events. The 2001 Agreement permitted Plaintiff to "take possession of all or part of the work" if ever Defendant Stuebner became subject to a "proceeding which prevents or interferes with [its] use of any of the supplies, tools, plant, machinery, equipment or other materials" involved in the project. 2001 Agreement ¶ VII(B)(f)(ii). The 2018 Agreement

provided Plaintiff would have an "absolute right" to "[t]ake possession of . . . the work under any . . . contracts relating to . . . [the] Bond" if ever Defendant committed a "Default." 2018 Agreement ¶ 10(b). The agreement defined "Default" to include any "demand for [Plaintiff] to pay or perform." 2018 Agreement ¶ 1(b)(v).

Both provided Plaintiff with discretion to settle or dispute any claims the school district brought under the bond. The 2001 Agreement provided Plaintiff could "adjust, settle or compromise any claim [or] demand." 2001 Agreement ¶ XIV. And the 2018 Agreement provided that "[Plaintiff] shall have the *absolute right* to adjust, settle, dispute, litigate, appeal, finance, or compromise any claim, demand . . . or exposure." 2018 Agreement ¶ 7 (emphasis added).

Both agreements also provided Plaintiff with all the rights and authority Plaintiff would need to complete the construction project if ever Plaintiff had to take over. In the 2001 Agreement, the signing Defendants "assign[ed]" to Plaintiff all their "rights . . . related to . . . any bonded . . . contracts" as well as "[a]ll right, title and interest" to the "work performed" on the project and to the "supplies, tools, plant, machinery, equipment and materials on or near" the work site. 2001 Agreement ¶ VII. The 2018 Agreement contains an almost identical provision. 2018 Agreement ¶ 9.

And both Agreements provided Defendants would be liable to indemnify Plaintiff for the losses Plaintiff incurred in connection with resolving claims brought under the bond. The 2001 Agreement provided that "the Indemnitors will indemnify and hold the Surety harmless for all loss, liability, damages and expenses . . . which the Surety incurs or sustains . . . because of having furnished any Bond." 2001 Agreement ¶ III. The signing Defendants specifically agreed they would be liable for the amount Plaintiff "deemed necessary . . . to protect itself from all

losses or expenses." 2001 Agreement ¶ IV. The 2018 Agreement provided for essentially the same scope of liability but further clarified that the signing Defendants would be liable for any of Plaintiff's payments that Plaintiff made "in the belief that either (1) [Plaintiff] was or might be liable therefore; or (2) [the] payments were necessary or advisable to protect Plaintiff's rights or to mitigate Plaintiff's potential lability or Loss." 2018 Agreement ¶¶ 5, 7.

During the course of the construction project, the school district terminated Defendant Stuebner's contract and made a claim against the performance bond. Am. Compl. ¶ 19; Am. Answer ¶ 19. Plaintiff honored the claim. Am. Compl. ¶ 20; Am. Answer ¶ 20.

Defendants allege that the school district's claim under the bond was meritless, that Defendant Stuebner notified Plaintiff that the claim was meritless, and that Plaintiff knew the claim was meritless. Am. Answer ¶¶ 47–49, 55, 57, 59–64, 80. But Plaintiff, Defendants allege, failed to conduct a reasonable investigation into the school district's claim and instead "recklessly agreed" to honor it. Am. Answer ¶¶ 53, 58, 65. Defendants allege that Plaintiff "knew that it would be sued by the School District and would bear all the risk of that lawsuit and the costs of defending it" if Plaintiff rejected the claim. Am. Answer ¶ 78. Plaintiff honored the school district's claim, Defendants allege, purely because Plaintiff "wanted to avoid a legal dispute" and "believed that acquiescing in the School District's claim was less likely to result in financial losses to [Plaintiff] than denying the claim," Am. Answer ¶¶ 67, 73.

After being terminated, Defendant Stuebner sued the school district for wrongful termination and prevailed. Am. Answer ¶¶ 83–85. While Defendant Stuebner's suit against the school district was pending, however, Plaintiff incurred significant expenses performing Defendants' construction obligations. Am. Compl. ¶ 23; Am. Answer ¶ 23. Defendants allege that many of these expenses were unnecessary and that Plaintiff failed to obtain compensation

4

from the school district for some of these expenses. Am. Answer ¶¶ 68, 69, 81. Defendants have not yet reimbursed Plaintiff. Am. Compl. ¶ 25; Am. Answer ¶ 25.

### b. Procedural History

Plaintiff filed suit seeking the enforce its indemnification agreements against Defendants and to collect payments Defendants allegedly owe Plaintiff under those agreements. *See* ECF No. 29. Defendants counterclaimed that Plaintiff acted in bad faith by honoring the school district's performance bond claim and breached the parties' indemnity and performance bond contracts in doing so. *See* ECF No. 33.[2] Plaintiff has moved to dismiss Defendants' counterclaim for failure to state a claim. *See* ECF No. 38. Plaintiff's motion is presently before the Court.

## III. LEGAL STANDARD

A motion to dismiss for failure to state a claim challenges a pleading's factual sufficiency. FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A claim is facially plausible when the pleading alleges enough facts to raise a reasonable expectation that discovery will reveal evidence of the claim's necessary elements. *Walker v. Coffey*, 956 F.3d 163, 166 (3d Cir. 2020).

In evaluating a motion to dismiss for failure to state a claim, courts in the Third Circuit follow a three-step process. *Hassen v. Gov't of Virgin Islands*, 861 F.3d 108, 115 (3d Cir. 2017). First, the Court outlines the elements a plaintiff must plead to state a claim for relief. *Id.* Then, the Court peels away allegations that are no more than conclusions, which are not entitled to the assumption of truth. *Id.* Finally, the Court reviews well-pled factual allegations, assumes their

---

[2] Defendants also asserted two other counterclaims but have since voluntarily dismissed those counterclaims. *See* ECF No. 42.

veracity, and proceeds to determine whether they could plausibly support an entitlement to relief. *Id.*

## IV. ANALYSIS

To state a claim for breach of contract under Pennsylvania law, the pleader must allege three elements: (1) the existence of a contract, (2) a breach of the contract, and (3) resultant damages. *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. L. Firm of Malone Middleman, P.C.*, 635 Pa. 427, 445 (2016). Plaintiff argues Defendants have failed to plausibly plead the second and third elements of their claim. The Court agrees that Defendants have failed to plead a plausible theory of breach and rests its decision on that basis.

In their counterclaim, Defendants plead that Plaintiff breached the indemnity agreements by acting in bad faith. The contract does not contain a clause expressly requiring the parties to perform their duties in good faith, but Defendants argue such a duty is implicit in the contracts. Pennsylvania law is unsettled as to when the duty of good faith and fair dealing can be implied into a contract. *See Ash v. Cont'l Ins. Co.*, 593 Pa. 523, 533 n.2 (2007) (acknowledging a split among lower courts but declining to resolve the disagreement); *see also Cessna v. REA Energy Coop., Inc.*, 258 F. Supp. 3d 566, 584–85 (W.D. Pa. 2017). Rather than guess as to whether the Pennsylvania Supreme Court would imply the duty of good faith into the parties' indemnity agreements, the Court will simply presume that such a duty may be implied because the presumption will not affect the result of the Court's analysis.

The implied duty of good faith does not have any fixed substantive content. *Stamerro v. Stamerro*, 889 A.2d 1251, 1259 (Pa. Super. Ct. 2005) ("[A] complete catalogue of types of bad faith is impossible."); *see also Cruz v. Dooley*, 262 A.3d 487, *6 (Pa. Super. Ct. 2021). Instead, it is essentially a gap-filling doctrine that facilitates "enforcement of the contract terms in a manner

that is consistent with the parties' reasonable expectations." *Stamerro*, 889 A.2d at 1259. As a gap-filling doctrine, the duty of good faith cannot override a contract's express terms, but instead must take its meaning *from* a contract's express terms. *Agrecycle, Inc. v. City of Pittsburgh*, 783 A.2d 863, 867 (Pa. Commw. Ct. 2001) (reasoning that the implied duty of good faith cannot "defeat[] a party's express contractual rights"); *Cruz*, 262 A.3d at *6–*7 (using contract's express terms to evaluate whether a party had performed in good faith). The duty of good faith also takes its substantive content from the real-world context in which it is being applied. *Stamerro*, 889 A.2d at 1259 ("The obligation to act in good faith in the performance of contractual duties varies somewhat with the context.").

Defendants allege Plaintiff acted in bad faith in essentially four ways. First, Defendants allege Plaintiff failed to reasonably investigate the school district's claim before honoring it. Second, Defendants allege Plaintiff honored the claim despite knowing that Plaintiff would not ultimately have been liable for the claim.[3] Third, Defendants allege Plaintiff incurred unnecessary expenses and failed to receive adequate compensation while completing the construction project. And fourth, Defendants allege Plaintiff was motivated to honor the school district's claim purely by self-interest. But none of these allegations support a plausible claim for breach of the implied duty of good faith.

---

[3] Defendants repeatedly cite to *Milton Regional Sewer Auth. v. Travelers Casualty & Surety Company of America* for the proposition that Plaintiff could have denied the school district's claim because the school district improperly terminated Defendant Stuebner. No. 4:13-CV-2786, 2014 WL 5529169, (M.D. Pa. Nov. 3, 2014), *aff'd,* 648 F. App'x 215 (3d Cir. 2016). Defendants are correct that *Milton Regional Sewer* stands for this proposition, and it is for this reason that the Court presumes for the purpose of this opinion that Plaintiff could have denied the school district's claim and would have been vindicated through litigation for doing so.

But the question before the Court is whether Plaintiff could have acted in bad faith by honoring a claim *despite* possessing the legal right to deny the claim. *Milton Regional Sewer* supplies no answer or reasoning relevant to this question.

For all Defendants except Defendant Peter Radwanski, these allegations cannot amount to bad faith because the express terms of the 2018 Agreement suggest the parties reasonably expected that Plaintiff could take the actions alleged.

The 2018 Agreement's express terms suggest the parties expected Plaintiff to have the discretion to honor a demand to take over without first investigating the demand. Specifically, the 2018 Agreement provided that Plaintiff could "[t]ake possession of . . . the work" if ever Defendant Stuebner committed a "Default" and defined "Default" to include a mere "demand for [Plaintiff] to pay or perform." 2018 Agreement ¶¶ 1(b)(v), 10(b). This Agreement did not require that Plaintiff investigate the demand before taking over or even that the demand be reasonable. Instead, the Agreement gave Plaintiff an "absolute" right to take over upon request. 2018 Agreement ¶ 10(b). Defendants allege that the school district did demand Plaintiff take over. Am. Answer ¶ 50. Under this allegation, the 2018 Agreement would have authorized to Plaintiff to exercise its "absolute" right to take over the project regardless of whether Plaintiff had first investigated the demand, so Plaintiff could not have acted in bad faith by doing just that.

The 2018 Agreement's express terms also suggest the parties expected that Plaintiff could honor claims for which Plaintiff would not ultimately be liable. The Agreement provided Plaintiff with the right to "adjust, settle, dispute, litigate, appeal, finance, or compromise *any* claim, demand . . . or exposure" and again made this right "absolute." 2018 Agreement ¶ 7 (emphasis added). The words "any" and "absolute" make clear that Plaintiff's right to honor claims was not limited to those claims for which Plaintiff would ultimately be held liable. Even if Plaintiff had known that it would not ultimately be liable for the school district's claim as Defendants allege, Am. Answer ¶ 90, the 2018 Agreement's express terms permitted Plaintiff to resolve the claim as it deemed best, so Plaintiff could not have acted in bad faith in doing so.

8

The 2018 Agreement's express terms also suggest the parties reasonably expected that Plaintiff would not be limited in its authority to incur expenses and pursue compensation after taking over the project. Quite simply, an "absolute right" to "settle . . . any claim" does not bespeak any limitation. 2018 Agreement ¶ 7 (emphasis added). Further, in the Agreement, Defendants assigned to Plaintiff all their "rights . . . related to" the "bonded . . . contract" as well as "all right, title and interest . . . in . . . the work performed" and "all supplies, tools, plant, machinery, inventory, equipment and materials" related to that work. *Id.* ¶ 9. Defendants could not have reasonably expected to limit Plaintiff's discretion to incur expenses and pursue compensation after assigning to Plaintiff all their rights related to completing the construction project.

That is not to say Defendants will necessarily be *liable* for all the expenses Plaintiff incurred, as different contractual language and interpretive principles control Defendants' obligations as indemnitors. *See, e.g.*, 2018 Agreement ¶¶ 5, 7; 16 Summ. Pa. Jur. 2d Commercial Law § 7:46 (2d ed.) ("A contract will not be construed to provide indemnification against a person's own negligence unless that intent is expressly and unequivocally stated."). But the language controlling Plaintiff's takeover rights clearly indicate that the parties reasonably expected Plaintiff would have unlimited discretion to incur expenses, pursue compensation, and otherwise manage the construction project if ever Plaintiff took over the project.[4]

---

[4] If Defendants had plead facts amounting to a fraudulent conspiracy in which Plaintiff had sought to *enrich* itself by manipulating its power to spend and then seek indemnification, then the Court might have had to identify a limit to Plaintiff's authority to incur expenses despite the Agreements' unrestrictive language. *Cf. Montanez v. HSBC Mortg. Corp. (USA)*, 876 F. Supp. 2d 504, 513–15 (E.D. Pa. 2012) (holding a mortgage lender could act in bad faith by using its contractual rights in a manner that would result in the lender receiving kickbacks from third parties). But Defendants have not alleged that Plaintiff stands to profit from the unnecessary expenses it has incurred—instead, under Defendants' allegations, Plaintiff *at most* stands to receive from Defendants the same amount Plaintiff has lost, which would leave Plaintiff no better off than it was before taking over the project.

Furthermore, the 2018 Agreement's express terms suggest the parties expected Plaintiff to act purely in its own interest. In the Agreement, the signing Defendants expressly agreed to indemnify expenses incurred not only on claims for which Plaintiff *would* be liable but also on claims for which Plaintiff "might" be liable. Am. Answer ¶ 7. The signing Defendants further agreed to indemnify Plaintiff for expenses incurred on claims Plaintiff resolved "in the belief" that doing so would "mitigate [Plaintiff's] potential liability or Loss." *Id.* Considering Defendants agreed to indemnify Plaintiff for the expenses Plaintiff incurred resolving claims of questionable merit and for the sole purpose of minimizing Plaintiff's potential losses, Defendants must have reasonably expected Plaintiff could in fact resolve claims of questionable merit for the sole purpose of minimizing Plaintiff's potential losses. Accordingly, Plaintiff would not have acted in bad faith by honoring the school district's demand purely in its own interest to avoid litigation and minimize costs, as Defendants allege.

As for Defendant Peter Radwanski, these allegations still cannot amount to bad faith because the 2001 Agreement's terms and the context in which the 2001 Agreement was executed both suggest that the parties reasonably expected Plaintiff could act as Defendants allege Plaintiff acted.

Like the 2018 Agreement's terms, the 2001 Agreement's terms describe Plaintiff's discretion and takeover rights expansively. *See* 2001 Agreement ¶ VII(B)(f)(ii) (permitting Plaintiff to take over the project whenever Defendant Stuebner become subject to a "proceeding" that "prevents or interferes with" Defendant Stuebner's ability to complete the project); *id.* ¶ XIV (granting Plaintiff the right to "adjust, settle or compromise *any* claim [or] demand") (emphasis added); *id.* ¶ VII (assigning to Plaintiff all Defendants' "rights . . . related to . . . any bonded . . . contracts"); *id.* ¶ IV (providing Defendants would be liable for any amount *Plaintiff*

"deemed necessary . . . *to protect itself* from all losses or expenses") (emphasis added). While the 2001 Agreement does not characterize Plaintiff's rights as "absolute" and is less explicit in identifying whether Plaintiff could take over a project the moment the obligee demanded such a takeover, the 2001 Agreement's terms still clearly express an intent to privilege Plaintiff's interests and maximize Plaintiff's discretion to takeover and complete the project.

Further, the 2001 Agreement represents a surety contract for a performance bond in the context of a construction project. By the time the parties entered this contract, it was settled in the construction context that sureties did not act in bad faith by honoring a claim purely out of self-interest or without thoroughly investigating the claim's merit. *U.S. Fid. & Guar. Co. v. Feibus*, 15 F. Supp. 2d 579, 585 (M.D. Pa. 1998), *aff'd,* 185 F.3d 864 (3d Cir. 1999) (rejecting the contractors' defense that the surety had acted in bad faith by failing to investigate a claim brought against the bond before honoring it); *Fid. & Deposit Co. of Maryland v. Bristol Steel & Iron Works, Inc.*, 722 F.2d 1160, 1165 (4th Cir. 1983) (applying Pennsylvania law and holding that a surety's decision to honor a claim purely for the purpose of getting off the obligee's "blacklist" provided "no justification for a finding of bad faith or fraud."); *see also Almi, Inc. v. Dick Corp.*, 31 Pa. Cmwlth. 26, 36 (1977) ("[T]he principal is bound not simply to indemnify the surety but to keep it unmolested.").

In light of the 2001 Agreement's express terms privileging Plaintiff's interests and maximizing Plaintiff's discretion to take over and complete the project and considering the pre-2001 precedents confirming sureties' broad authority to prioritize their own interests, it is clear that the parties would have reasonably expected that Plaintiff could settle the school district's claim precisely as Defendants allege Plaintiff did. Accordingly, Defendant Radwanski's allegations cannot state a claim for breach of the duty of good faith either.

11

## V.     CONCLUSION

In light of the terms of the parties' surety contracts and the fact that these contracts were meant to apply in context of the construction industry, Plaintiff would not have acted in bad faith by honoring a claim without thoroughly investigating it, by honoring a claim that was meritless, by incurring unnecessary expenses and receiving inadequate compensation after taking over Defendants' obligations, or by honoring a claim purely for the purpose of protecting Plaintiff's own interests. Accordingly, the Court grants Plaintiff's motion to dismiss for failure to state a claim.

BY THE COURT:

*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge